UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| T MOORE SERVICES, LLC | CIVIL ACTION NO. 6:10-cv-1221 (Lead) |
| | 6:10-cv-1336 (Member) |
| | 6:10-cv-1356 (Member) |
| | 6:10-cv-1374 (Member) |
| VERSUS | MAGISTRATE JUDGE HANNA |
| RENTROP TUGS INC., ET AL. | BY CONSENT OF THE PARTIES |

### MEMORANDUM RULING

Before this Court is the motion for partial summary judgment as to the measure of recoverable damages (Rec. Doc. 124), which was filed by Rentrop Tugs, Inc., Transinland Marine, Inc., T&R Tugs, L.L.C., Dupre Marine Transportation, Inc., and Mallard Towing, L.L.C. (collectively referred to hereinafter as "the defendant-towers.") The motion is opposed. Oral argument was held on February 29, 2012. For the following reasons, the motion is granted in part and denied in part.

#### FACTUAL BACKGROUND

On April 30, 2010, Rig 61 (sometimes referred to in the pleadings as Hercules 61 or Falcon 61), which had been purchased for salvage by T. Moore Services, L.L.C., sank in the Charenton Drainage and Navigation Canal near T. Moore's

salvage yard.[1]   Several lawsuits arose out of this incident and have been consolidated.

T. Moore operates a salvage yard located near Franklin on the Charenton Canal.[2]   T. Moore purchased several scrap rigs that were sitting on the bottom of Lake Decade and planned to move them to T. Moore's yard to be disassembled and sold for scrap.[3]   T. Moore contracted with one or more of the defendant-towers to move Rig 61 from Lake Decade to T. Moore's yard.  In its complaint, T. Moore alleges that Rig 61 sank in the Charenton Canal due to the negligence of the defendant-towers.

The instant motion addresses the types of damages that T. Moore might ultimately be able to recover in these consolidated lawsuits.  T. Moore paid $200,000 to purchase Rig 61[4] but did not obtain any P&I or hull insurance on Rig 61.[5]   T. Moore sold the derrick of Rig 61 for $3,200.[6]   After Rig 61 sank, T. Moore filed for bankruptcy protection, and the bankruptcy trustee sold Rig 61 to LAD Salvage, LLC

---

[1]   Rec. Doc. 1 at ¶1.

[2]   Rec. Doc. 1 at ¶12.

[3]   Rec. Doc. 1 at ¶13.

[4]   Rec. Doc. 124-2 at 2, 18.

[5]   Rec. Doc. 124-2 at 19-20.

[6]   Rec. Doc. 124-2 at 29.

for $160,000.[7]  LAD eventually removed Rig 61 from the Charenton Canal and delivered it to a scrap yard in Gibson, Louisiana.[8]  T. Moore is no longer in business.[9]  In its complaint,[10] T. Moore alleges that it sustained the following types of damages due to the sinking of Rig 61:

    A.    the lost value of Rig 61;

    B.    the lost profit anticipated from the salvage of Rig 61;

    C.    environmental cleanup expenses, engineering expenses, diving expenses, and other expenses associated with the sinking of Rig 61;

    D.    the loss of its business;

    E.    potential liability to the United States under the Wreck Act, 33 U.S.C. § 409 *et seq.*;

    F.    anticipated liability to third parties for business interruption losses due to the canal being blocked;

    G.    punitive damages; and

    H.    other unspecified damages.[11]

---

[7]     Rec. Doc. 124-1 at 7.

[8]     Rec. Doc. 124-2 at 57-63.

[9]     Rec. Doc. 127- 3 at 3.

[10]     Rec. Doc. 1 at 10.

[11]     Rec. Doc. 1 at 10, ¶ 36(A) through (H).

In their motion, the defendant-towers argue that T. Moore cannot recover for lost profit, destruction of business, or any other consequential damages. They seek a partial summary judgment setting the recoverable value of Rig 61 and dismissing any and all claims for damages set forth in Paragraph 36 (B), (D), (E), and (F) of T. Moore's complaint.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[12] A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[13]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that

---

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[13] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252; *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

demonstrate the absence of genuine issues of material fact.[14] If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[15] All facts and inferences are construed in the light most favorable to the nonmoving party.[16]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim.[17] The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[18]

## II.  THE RECOVERABLE DAMAGES

T. Moore seeks to recover eight types of damages, and the defendant-towers seek a declaration that four of those categories of damages cannot be recovered in this

---

[14] *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[15] *Id*.

[16] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008), citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[17] *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008), citing *Celotex Corp. v. Catrett*, 477 U.S. at 325.

[18] *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

case. They also seek a declaration as to the recoverable value of Rig 61. They suggest that the sinking of Rig 61 in the Charenton Canal was an event that established the way that the value of the rig should be calculated.

When a vessel is damaged in a marine casualty, "[l]osses are classified in three ways – total, partial, and constructive total. . . . A loss is deemed total when the ship is lost. A loss is deemed constructive total when the cost of repairs exceeds the ship's value. Any other loss is partial."[19] The amount that the vessel owner can recover for the loss depends upon the type of loss sustained. "If a loss is total, the measure of damages is the market value, if there is one, of the vessel lost. If a loss is partial, the measure of damages is the reasonable value of repairs plus demurrage occasioned by the time taken to complete the repairs. If a loss is deemed a constructive total loss, damages are the ship's value at the time of collision, less salvage."[20]

This case presents an interesting factual scenario in that, while the parties do not dispute that Rig 61 is a vessel, it was not a vessel capable of being used in navigation or in oil and gas exploration activities at the time of the incident sued upon. In its complaint, T. Moore alleged that Rig 61 and the other rigs it purchased

---

[19] *Zanzibar Shipping, S. A. v. Railroad Locomotive Engine Number 2199*, 533 F.Supp. 392, 394 (D.C .Tex. 1982).

[20] *Zanzibar Shipping v. Railroad*, 533 F.Supp. at 394. See, also, *Gaines Towing and Transp., Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 635 (5th Cir. 1999).

at the same time were "scrap rigs from the Offshore Drilling Company that were sitting on the bottom of Lake Decade. The rigs had been permanently taken out of navigation, were all in a state of disrepair, and were to be moved from their location in Lake Decade to T. Moore Services, L.L.C.'s scrap yard to be cut up and disassembled for scrap."[21] T. Moore allegedly hired defendant Rentrop Tugs, Inc. to pump out Rig 61 and the other rigs and tow them "from their location on the bottom of Lake Decade to her scrap yard."[22] According to T. Moore, Rentrop had to "work her [Rig 61] loose from the lake bottom"[23] and determine if it was safe to float the rig before it could be transported to T. Moore's yard. Several times in its complaint, T. Moore referred to Rig 61 as a "scrap rig" or "salvage rig."[24]

Before it sank in the Charenton Canal, Rig 61 was already a wreck that was sitting on the bottom of Lake Decade. It was not retrieved from that location so that it could be used in oil and gas operations but solely for the purpose of being transported to a salvage yard so that the metal from which the rig was constructed could be sold and recycled. In fact, it is alleged in T. Moore's complaint that Rig 61

---

[21] Rec. Doc. 1 at ¶ 13.

[22] Rec. Doc. 1 at ¶ 14.

[23] Rec. Doc. 1 at ¶ 18.

[24] Rec. Doc. 1 at ¶¶ 13, 14, 16, 18, 19, 33, 34, 35, 36,.

sank in the Charenton Canal because the defendant-towers knew there was a hole in the rig, knew that the hole had to be placed against the bank to keep the rig from sinking[25] but did not do so.[26]

An interesting issue, not addressed by the parties in their briefing, is whether the condition of Rig 61 – before it was towed to the Charenton Canal – has an effect on its value after it sank in the Charenton Canal.

No argument has been made that Rig 61 was a partial loss. It is undisputed that T. Moore intended to sell the rig for salvage, and it is equally undisputed that, after the rig was removed from Lake Decade then retrieved from the Charenton Canal, Rig 61 was sold by T. Moore's bankruptcy trustee to a company that removed the rig from the canal so that it could be deconstructed and sold for salvage. Therefore, it appears that Rig 61 was either a total loss or, as contended by the defendant-towers, a constructive total loss. But that characterization may not have been solely the result of the rig's sinking in the Charenton Canal. The rig was already arguably a wreck when it was purchased by T Moore. Still, the defendant-towers argue that, after it

---

[25] Rec. Doc. 1 at ¶ 19.

[26] Rec. Doc. 1 at ¶¶ 24, 27, 33, 34.

sank in the Charenton Canal, Rig 61 was a constructive total loss[27] and should be valued as such.

"A vessel is considered a constructive total loss when the damage is repairable but the cost of repairs exceeds the fair market value of the vessel immediately before the casualty."[28] "In such a case repair is not economically practicable, and the market value of the vessel is the ceiling of recovery."[29] The market value of such a vessel is generally established by evidence of contemporaneous sales of similar vessels,[30] but other reasonable methods of valuation, such as replacement cost, depreciation, or expert opinion are sometimes used.[31] When a vessel is deemed a constructive total loss, the owner is not permitted to recover for lost future profits,[32] loss of use,[33] or

---

[27] Rec. Doc. 124-1 at 5.

[28] *Gaines Towing v. Atlantia*, 191 F.3d at 635; *Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.*, 792 F.2d 489, 491 (5th Cir. 1986).

[29] *Gaines Towing v. Atlantia*, 191 F.3d at 635.

[30] *Standard Oil Co. v. Southern Pac. Co.*, 268 U.S. 146, 155-56 (1925).

[31] *E.I. DuPont de Nemours & Co., Inc. v. Robin Hood Shifting & Fleeting Service, Inc.*, 899 F.2d 377, 379-80 (5th Cir. 1990); *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1185-86 (5th Cir. 1984).

[32] *Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642, 648 (5th Cir. 1989).

[33] *King Fisher v. NP Sunbonnet*, 724 F.2d at at 1187; *Ryan Walsh Stevedoring v. James Marine*, 792 F.2d at 491.

consequential damages.[34]  Interest can be recovered.[35]  In a proceeding to limit liability, the owner of the vessel bears the burden of persuasion regarding the value of its vessel.[36]

With these principles in mind, each category of claimed damages will be discussed in turn.

### A. THE LOST VALUE OF RIG 61

The defendant-towers concede that T. Moore is entitled to recover the value of Rig 61 but they seek to have that value fixed by the Court at $36,800 plus interest. This figure was reached by taking the $200,000 that T. Moore paid for Rig 61 before the accident, subtracting the $3,200 that T. Moore received for the sale of the derrick, and subtracting the $160,000 that the bankruptcy trustee received for the sale of the rig at auction.[37]  In response, T. Moore argues that a different method should be used to calculate the market value of the vessel.  T. Moore suggests that Rig 61 weighed

---

[34] *Albany Ins. Co. v. Bengal Marine, Inc.*, 857 F.2d 250, 253 (5th Cir. 1988).

[35] *Standard Oil v. Southern Pac.*, 268 U.S. at 155; *Ryan Walsh Stevedoring v. James Marine*, 792 F.2d at 492.

[36] *Allseas Maritime, S.A. v. M/V Mimosa*, 812 F.2d 243, 249 (5th Cir. 1987). See, also, *Schilling Enterprises, LLC v. Superior Boat Works, Inc.*, No. 4:04CV343-D-D, 2006 WL 2577848, at *5 (N.D. Miss. Aug. 31, 2006) (stating "[t]he burden is on the vessel's owner to establish the market value of the vessel.")

[37] Rec. Doc. 124-1 at 13.

approximately 2,150 tons,[38] and that scrap metal is valued at approximately $425 per ton,[39] making the value of the rig approximately $913,750.

The parties' competing calculations of the value of the rig are equally plausible. Therefore, the Court finds that, if the defendant-towers are ultimately found liable to T. Moore, T. Moore will be entitled to recover the value of the rig; however, a genuinely disputed issue of material fact exists regarding the value of the rig. Therefore, the defendant-towers' motion will be denied to the extent that it seeks to have the value of the rig fixed at $36,800.

### B.  THE LOST PROFIT ANTICIPATED FROM THE SALVAGE OF RIG 61

The defendant-towers argue that, because Rig 61 was a constructive total loss, T. Moore is precluded from recovering for lost profit. They further argue that the salvage value of the vessel, i.e., the 2,150 tons that the vessel weighs multiplied by the $425 per ton value of the metal used in constructing the vessel, is the amount of profit that T. Moore would have earned if it had salvaged the vessel itself.

As noted above, however, T. Moore argues that the salvage value of the vessel is the vessel's fair market value and not lost profit. The Court finds that a genuinely

---

[38]   Rec. Doc. 127-4 at 3.

[39]   Rec. Doc. 127-3 at 13.

disputed issue of material fact exists concerning what the value of Rig 61 is and how it should be calculated. Noting that it is well-settled that a vessel owner is not entitled to recover lost profits when its vessel is determined to be a total loss or a constructive total loss, the Court further finds that there is a genuinely disputed issue of fact as to whether T. Moore's calculation of the value of the rig is market value or lost profits. Accordingly, at this time, the defendant-towers' motion will be denied with regard to T. Moore's claim for lost profits.

### C. ENVIRONMENTAL CLEANUP EXPENSES, ENGINEERING EXPENSES, DIVING EXPENSES, AND OTHER EXPENSES ASSOCIATED WITH THE SINKING OF RIG 61

The defendant-towers do not seek to limit T. Moore's ability to recover this category of damages, stating that they "might be recoverable but are subject to further proof and consideration."[40] Accordingly, the defendant-towers' motion is denied with regard to this category of damages.

### D. LOSS OF T. MOORE'S BUSINESS

The defendant-towers argue that when a vessel is a total loss or a constructive total loss, maritime law does not permit the vessel owner to recover for the loss of use

---

[40] Rec. Doc. 124-1 at 16.

of the vessel or any other consequential damages.  T. Moore argues that it went out of business as a result of the sinking of Rig 61 in the Charenton Canal.  The Court finds that it is well-settled that consequential damages are not allowed in such a situation.  Accordingly, the defendant-towers' motion will be granted with regard to this category of claimed damages.

### E.  POTENTIAL LIABILITY TO THE UNITED STATES

The United States responded to the limitation actions filed in this litigation by asserting a claim under the Rivers and Harbors Act, 33 U.S.C. § 403, which prohibits the creation of any unauthorized obstruction in the navigable water of the United States and imposes both civil and criminal liability for such actions.[41]   The United States also asserted a public nuisance claim.[42]

Once Rig 61 was removed from the canal, however, the United States requested that its claim be dismissed.[43]  That motion was granted.[44]  Although the government's claims were dismissed without prejudice so that the claim could theoretically be

---

[41]  Rec. Doc. 38 at 6.

[42]  Rec. Doc. 38 at 7.

[43]  Rec. Doc. 116.

[44]  Rec. Doc. 117.

raised in the future if the government learns that the remnants of Rig 61 actually do pose a hazard to navigation, that possibility appears remote. Before filing the motion to dismiss, the government conducted multibeam and side scan surveys and concluded that it was "unaware of any present navigational difficulty associated with the presence of the debris pile that could be from Rig 61."[45]  Since no claim by the government currently exists, the defendant-towers' motion will be denied as moot with regard to this category of damages.

### F. ANTICIPATED LIABILITY TO THIRD PARTIES FOR BUSINESS INTERRUPTION LOSSES DUE TO THE CANAL BEING BLOCKED

In its complaint, T. Moore states that it is seeking, in this lawsuit, to recover from the defendant-towers any amounts that T. Moore is required to pay to third parties who assert claims against T. Moore for business interruption losses resulting from Rig 61's blocking of the Charenton Canal. Only one such claim has been asserted, and it was dismissed early on in the litigation on the basis of the rationale of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).[46]  The plaintiff articulated no opposition to the defendant-towers' motion with regard to this category

---

[45]  Rec. Doc. 116-1 at 4.

[46]  Rec. Doc. 83, 90.

of damages. There being no evidence of any such claims asserted in this litigation other than the one that was dismissed, the defendant-towers' motion will be granted with regard to this category of damages.

### G.  PUNITIVE DAMAGES

The defendant-towers' motion does not expressly seek to limit the recovery of punitive damages, and neither the plaintiff nor the defendant-towers briefed the issue of whether punitive damages are recoverable in this case. Accordingly, the Court is unable to make a ruling in that regard, and the motion is denied with regard to this type of damages.

### H.  OTHER UNSPECIFIED DAMAGES

The defendant-towers' motion does not expressly seek to limit the recovery of any other damages that were not specifically listed in T. Moore's complaint but might be proved at trial. Therefore, the defendant-towers' motion will be denied with regard to this category of damages.

## CONCLUSION

In summary, the defendant-towers' motion for partial summary judgment on the issue of damages (Rec. Doc. 124) is granted in part and denied in part. More particularly, the motion is denied with regard to the defendant-towers' request that the value of Rig 61 be fixed. The motion is granted with regard to T. Moore's request for damages resulting from its going out of business (Paragraph 36(d) of the complaint) and with regard to T. Moore's request for damages arising from third-party business interruption claims (Paragraph 36(F) of the complaint), and T. Moore will be barred from recovering damages in those categories. In all other respects, the motion is denied.

Signed at Lafayette, Louisiana, this 2nd day of March 2012.

Patrick J. Hanna
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)